[Cite as *State v. Adkins*, 2016-Ohio-7250.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
SCIOTO COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| | : | Case No. 14CA3674 |
| Plaintiff-Appellee, | : | |
| | : | |
| vs. | : | DECISION AND JUDGMENT |
| | : | ENTRY |
| MICHAEL ADKINS, | : | |
| | : | |
| Defendant-Appellant. | : | **Released: 09/30/16** |

_____

APPEARANCES:

Bryan Scott Hicks, Lebanon, Ohio, for Appellant.

Mark E. Kuhn, Scioto County Prosecuting Attorney, and Shane A. Tieman, Assistant Prosecuting Attorney, Portsmouth, Ohio, for Appellee.

_____

McFarland, J.

{¶1} Michael Adkins appeals his conviction in the Scioto County Court of Common Pleas after a jury of his peers found him guilty of one count of endangering children, R.C. 2919.22(B)(1)(E)(1)(2)(d), a felony of the second degree. On appeal, Appellant challenges the sufficiency and manifest weight of the evidence upon which he was convicted. However, after reviewing the record, we find no merit to Appellant's arguments. Accordingly, we overrule Appellant's sole assignment of error and affirm the judgment of the trial court.

FACTS

{¶2}  On August 3, 2013, a 24-day old infant we will reference as "M.A." was taken to Southern Ohio Medical Center ("SOMC") emergency room by her parents, Christi Adkins ("Adkins") and Michael Adkins ("Appellant").  The Adkins family lived in West Portsmouth with M.A. and three other young daughters.[1]  At SOMC, Mr. and Mrs. Adkins gave a history of M.A.'s leg being injured the day before when she kicked her father's face while they were playing.  The baby was examined and x-rayed. The emergency room physician on duty determined that M.A. should be transferred to Nationwide Children's Hospital ("Children's Hospital") for further evaluation.  A social worker was called in to assist the family and obtain information.  M.A. was transferred the same evening.

{¶3}  At Children's Hospital, Dr. Jonathan Thackeray, the medical director for the Center for Family Safety and Healing, performed an examination of M.A. and ordered further diagnostic testing.  The infant was diagnosed with multiple leg fractures and abdominal wall bruising, suspected to be the result of non-accidental trauma, i.e. child abuse.  At Appellant's trial in 2014, M.A.'s mother testified M.A. now seems fine and has no trouble walking.

---

[1] At the time of trial, Appellant's 13-year-old daughter from a previous relationship, A.K., resided with the Adkins family in West Portsmouth, but she did not reside with them in August 2013.

{¶4} On August 5, 2013, Detectives Daniel Malone and Jodi Conkel of the Scioto County Sheriff's Department questioned Mr. and Mrs. Adkins at Children's Hospital. On August 6, 2013, Mr. and Mrs. Adkins were asked to come to the sheriff's department for further questioning and at that time gave videotaped interviews. On September 26, 2013, Appellant was indicted on two counts, felonious assault and child endangering, both second degree felonies.

{¶5} Appellant eventually proceeded to a jury trial which occurred in November 2014. The State's theory of the case was that Appellant was the only person who had the opportunity to have abused M.A. The State presented detailed medical evidence which included documentation of symptoms first occurring on the evening of August 2, 2013. The evidence demonstrated that Appellant was alone with M.A. for 2-3 hours prior to the onset of symptoms. The State pointed out the couple's initial statements that other persons and the other children were not left alone with M.A.

{¶6} Appellant and his wife denied Appellant abused M.A. Appellant repeated his initial statement that M.A. had kicked him while they were playing and he believed she had injured her right leg in that manner. He also introduced evidence that M.A. had hurt herself or that someone else with access to M.A. had injured her in the days before August 2, 2013.

**{¶7}** The jury ultimately returned verdicts which acquitted Appellant of felonious assault and convicted him of child endangering. This timely appeal followed. Where relevant, additional facts will be related below.

ASSIGNMENT OF ERROR

"I. THE VERDICT WAS AGAINST THE SUFFICIENCY OF
THE EVIDENCE AS WELL AS AGAINST THE MANIFEST
WEIGHT OF THE EVIDENCE."

A.  STANDARD OF REVIEW

**{¶8}** A claim of insufficient evidence invokes a due process concern and raises the question of whether the evidence is legally sufficient to support the verdict as a matter of law. *State v. Wickersham,* 4th Dist. Meigs No. 13CA10, 2015-Ohio-2756, ¶ 22, citing *State v. Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). When reviewing the sufficiency of the evidence, our inquiry focuses primarily upon the adequacy of the evidence; that is, whether the evidence, if believed, reasonably could support a finding of guilt beyond a reasonable doubt. *Thompkins,* syllabus. The standard of review is whether, after viewing the probative evidence and inferences reasonably drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443

U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Jenks,* 61

Ohio St.3d 259, 273, 574 N.E.2d 492 (1991).  Furthermore, a reviewing

court is not to assess "whether the state's evidence is to be believed, but

whether, if believed, the evidence against a defendant would support a

conviction." *Thompkins*, 78 Ohio St.3d at 390 (Cook, J., concurring).

{¶9}  Thus, when reviewing a sufficiency-of-the-evidence claim, an

appellate court must construe the evidence in a light most favorable to the

prosecution. *State v. Hill,* 75 Ohio St.3d 195, 205, 661 N.E.2d 1068 (1996);

*State v. Grant,* 67 Ohio St.3d 465, 477, 620 N.E.2d 50 (1993).  A reviewing

court will not overturn a conviction on a sufficiency-of-the-evidence claim

unless reasonable minds could not reach the conclusion that the trier of fact

did. *State v. Tibbetts,* 92 Ohio St.3d 146, 162, 749 N.E.2d 226 (2001); *State*

*v. Treesh,* 90 Ohio St.3d 460, 484, 739 N.E.2d 749 (2001).

{¶10}  "Although a court of appeals may determine that a judgment of

a trial court is sustained by sufficient evidence, that court may nevertheless

conclude that the judgment is against the weight of the evidence."

*Wickersham, supra,* at ¶ 24, quoting *Thompkins,* 78 Ohio St.3d at 387.

> " 'Weight of the evidence concerns the inclination of the greater
> amount of credible evidence, offered in a trial, to support one
> side of the issue rather than the other.  It indicates clearly to the
> jury that the party having the burden of proof will be entitled to
> their verdict, if, on weighing the evidence in their minds, they
> shall find the greater amount of credible evidence sustains the

issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.' " *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 12, quoting *Thompkins,* 78 Ohio St.3d at 387, quoting Black's Law Dictionary 1594 (6th Ed.1990).

**{¶11}** When an appellate court considers a claim that a conviction is against the manifest weight of the evidence, the court must dutifully examine the entire record, weigh the evidence, and consider the credibility of witnesses. *Wickersham, supra,* at ¶ 25. The reviewing court must bear in mind, however, that credibility generally is an issue for the trier of fact to resolve. *State v. Issa,* 93 Ohio St.3d 49, 67, 752 N.E.2d 904 (2001); *State v. Murphy*, 4th Dist. Ross No. 07CA2953, 2008-Ohio-1744, ¶ 31. " 'Because the trier of fact sees and hears the witnesses and is particularly competent to decide "whether, and to what extent, to credit the testimony of particular witnesses," we must afford substantial deference to its determinations of credibility.' " *Wickersham, supra,* quoting *Barberton v. Jenney,* 126 Ohio St.3d 5, 2010-Ohio-2420, 929 N.E.2d 1047, ¶ 20, quoting *State v. Konya,* 2nd Dist. Montgomery No. 21434, 2006-Ohio-6312, ¶ 6, quoting *State v. Lawson,* 2nd Dist. Montgomery No. 16288 (Aug. 22, 1997). As the *Eastley* court explained:

> " '[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment must be made in favor of the judgment and the finding of facts.

\* \* \*

> If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.' " *Eastley* at ¶ 21, quoting *Seasons Coal Co., Inc. v. Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn.3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191-192 (1978).

{¶12} Thus, an appellate court will leave the issues of weight and credibility of the evidence to the fact finder, as long as a rational basis exists in the record for its decision. *State v. Picklesimer,* 4th Dist. Pickaway No. 11CA9, 2012-Ohio-1282, ¶ 24; *accord State v. Howard,* 4th Dist. Ross No. 07CA2948, 2007-Ohio-6331, ¶ 6 ("We will not intercede as long as the trier of fact has some factual and rational basis for its determination of credibility and weight.").

{¶13} Once the reviewing court finishes its examination, the court may reverse the judgment of conviction only if it appears that the fact-finder, when resolving the conflicts in evidence, " 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered .' " *Wickersham, supra,* at ¶ 26; *Thompkins,* 78 Ohio St.3d at 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).  A reviewing court should find a conviction against the manifest weight of the evidence only in the " 'exceptional case in which the

evidence weighs heavily against the conviction.' " *Id.,* quoting *Martin,* 20

Ohio App.3d at 175; *State v. Lindsey,* 87 Ohio St.3d 479, 483, 721 N.E.2d

995 (2000).

## LEGAL ANALYSIS

{¶14}  Appellant was convicted of R.C. 2919.22(B)(1)(E)(2)(d),

endangering children.  The relevant portions of the statute provide as

follows:

> "(B) No person shall do any of the following to a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age:
>
> (1) Abuse the child;
>
> * * *
>
> (E)(1) Whoever violates this section is guilty of endangering children.
>
> * * *
>
> (d) If the violation is a violation of division (B)(1) of this section and results in serious physical harm to the child involved, a felony of the second degree."

{¶15}  While the State asserts the jury had sufficient evidence on each

element of the crime charged to prove Appellant's guilt of child endangering

beyond a reasonable doubt, Appellant contends the evidence at trial was not

legally sufficient to sustain a verdict against him.  Appellant points to the

circumstantial nature of the evidence that he recklessly endangered his own

infant.  We must agree with Appellant that a great deal of circumstantial

evidence was presented in his case.  However, we also observe:

> "[D]irect evidence of a fact is not required.  Circumstantial
> evidence * * * may also be more certain, satisfying, and
> persuasive than direct evidence." *State v. Grube*, 987 N.E.2d
> 287, 2013-Ohio-692, ¶ 30, quoting *State v. Lott*, 51 Ohio St.3d
> 160, 555 N.E.2d 293 (1990), citing *Michalic v. Cleveland
> Tankers, Inc.*, 364 U.S. 325, 330, 81 S.Ct. 6, 10, (1960), citing
> *Rogers v. Missouri Pacific RR Co*, 352 U.S. 500508, fn.17, 77
> S.Ct. 443, 449, fn.17, (1957).  Even murder convictions and
> death sentences can rest solely on circumstantial evidence.
> *Grube, supra,* citing *State v. Apanovitch,* 33 Ohio St.3d 19, 514
> N.E.2d 394 (1987); *State v. Nicely, 39* Ohio St.3d 147, 151, 529
> N.E.2d 1236, 1239 (1988)."

**{¶16}** At the outset, we summarize the medical evidence which was

presented to the jury for consideration:

> 1)  M.A.'s pediatrician, Dr. Steven Keys, testified that he saw
> M.A. three times after her birth and prior to her trip to the
> SOMC emergency room on August 3, 2013.  His records
> demonstrate essentially normal exams, no pain or bruising, and
> the description of M.A. as healthy and "well-cared for," despite
> being "fussy" on two of the three visits.  Specifically, Dr. Keys
> and his nurse practitioner performed hip manipulations to see if
> the hips had been dislocated during birth.  Dr. Keys testified
> there was no indication of pain and injury during the
> manipulations.  M.A. did not react with any pain or crying.

> 2)  SOMC emergency room physician Dr. Jason Cheatham
> testified that M.A. was presented with right leg complaints on
> August 3, 2013.  He documented redness on top of the foot and
> tenderness to the right foot, ankle, and lower leg.  He and
> another physician examined M.A.[2]  She cried when the right leg
> was touched or repositioned, consistent with injury.  Dr.

---

[2] Later testimony and the records indicate the other physician was a Dr. Ross who did not testify at trial.

Cheatham further testified the history documented in the records indicated that M.A. kicked her father with such force that it loosened his tooth. Dr. Cheatham testified an infant that age could not exhibit that kind of force. Due to the injury and the history of injury documented in the records, x-rays were obtained. Dr. Cheatham specifically testified although he was not a radiologist, in his opinion the x-rays revealed a "prime example of child abuse," given the incongruent history of injury. Dr. Cheatham coordinated with the social worker to obtain further information and arrange transport to Children's Hospital.

3) SOMC radiologist Dr. Nathan Bennington testified that the images on the x-rays showed multiple recent "corner" or "bucket" fractures highly-suggestive of abuse, so "classic" that he used them in his teaching. He testified the fractures were not consistent with the history of injury. He further testified the fractures were "acute," meaning recent.[3] He testified the pain and swelling caused by the fractures would start immediately after the fracture occurred. He testified the healing of those type of fractures occurs in one-to-two weeks. Dr. Bennington testified the mechanism of injury for those types of fractures is shaking, twisting, or blunt trauma.

4) Children's Hospital pediatric radiologist Dr. Sally Smith testified that the multiple fractures were, without a doubt in her opinion, caused by abuse by shaking or twisting, and would not occur by ordinary playing or handling of M.A. She specified 7 separate fractures.

5) SOMC social worker Jennifer Estep testified that upon informing Adkins that M.A. would be transferred to Children's Hospital and that Children's Services would be contacted, she immediately responded: "I knew you would think we abused our daughter";

---

[3] Dr. Bennington explained an older injury would have a callous formation around it instead of being a sharp fracture line, as reflected on M.A.'s x-rays.

6)  Adkins' step-mother, Aronessa Butler, testified that prior to leaving M.A. with Appellant on the date of injury, she diapered M.A. and saw no swelling or bruising but when she returned 2-3 hours later, she noticed a red mark on M.A.'s abdomen and Appellant questioned her a couple of times: "Do you think her leg is broken?"

7)  Children's Hospital physician Dr. Jonathan Thackeray's testimony corroborated Dr. Bennington's diagnosis of "corner" or "bucket-handle" fractures.  Additionally, Dr. Thackeray testified M.A. had bruising of her abdominal wall and multiple fractures of both legs.  He specifically testified the history provided of kicking her father would not result in a fracture, let alone multiple fractures.  He testified that multiple fractures were caused by shaking or forceful pulling of the bone, pulling or twisting, i.e. excessive force.  He testified the symptoms of pain would appear within minutes, hours, or 1-2 days, but not three weeks.  Dr. Thackeray also ruled out childbirth as the mechanism of injury.

8)  Dr. Thackeray identified Exhibits 20 and 21, photographs of bruising on the right side of M.A.'s abdominal wall, running along her belly button.  He also identified Exhibits 22, 23 and 24, photographs of the left side of M.A.'s abdomen which showed bruising similar to the right side.  He testified sticky tape on a diaper would not result in that type of bruising because bruising is trauma to blood vessels underneath the skin. He further testified that blood testing was performed to see if M.A. had something wrong with her blood or bone health, but this testing was normal.  Dr. Thackeray testified the presence of bruising and multiple fractures caused him to be concerned with abuse, given there was no reasonable explanation for the injuries.

{¶17} R.C. 2919.22(B)(1) sets forth the essential elements of the

offense of endangering a child as follows: "No person shall * * * abuse the

child."  A successful R.C. 2919.22(B)(1) conviction requires the State to

prove beyond a reasonable doubt: (1) that the child is under eighteen years of age; (2) an affirmative act of abuse occurred; and (3) that the defendant recklessly committed the act of abuse. *State v. Swain*, 2002 WL 146204 (Jan. 23, 2002). *See State v. Ivey* (1994), 98 Ohio App.3d 249, 257, 648 N.E.2d 519, 525; *see also McGee, supra*; *State v. Burdine Justice*, 125 Ohio App.3d 707, 713, 709 N.E.2d 551, 555(1998).  To establish an affirmative act of abuse, the State must show that the defendant committed "an act which inflicts serious physical harm or creates a substantial risk of serious harm to the physical health or safety of the child." *Swain, supra*; *Ivey,* 98 Ohio App.3d at 257, 648 N.E.2d at 525; *Burdine Justice,* 125 Ohio App.3d at 714, 709 N.E.2d at 555.  R.C. 2901.22(C) defines "recklessly" as follows:

> "A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature.  A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist."

R.C. 2901.01(A)(5) includes in its definition of "serious physical harm":

> (c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;
>
> * * *

(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

{¶18}  In addition to the pertinent medical testimony set forth above, the State called Aronessa Butler, Adkins' step-mother, to testify during the case-in-chief.  She testified on August 2, 2013, she and her husband took Adkins shopping for school supplies.  Before they left, Mrs. Butler changed M.A.'s diaper.  She testified she did not notice any swelling of the legs or bruising on the abdomen.  M.A. was "fussy" but did not seem to be in pain. When the Butlers and Adkins left, Appellant, M.A., and the older daughters remained at home.[4]

{¶19}  Mrs. Butler testified they were gone 2-3 hours to Walmart and a nearby Bob Evans.  While they were eating, Adkins and Appellant talked on the phone once.  Mrs. Butler could hear them conversing about changing M.A.'s diaper.  Mrs. Butler testified Appellant told Adkins that M.A. "hurt when you touched her heel," and she was "fussing."

{¶20} When they returned to the Adkins' home, Mrs. Butler examined M.A.  Mrs. Butler did not notice swelling, but did notice a red mark on her abdomen.  Mrs. Butler testified Appellant asked her a couple of times "Do you think her leg is broken?"  Mrs. Butler opined that the leg was not broken

---

[4] The evidence is not clear on this point as Adkins testified only two of the older girls were home and at some point, S.A. came home.

but had a minor injury of some sort.  She advised taking M.A. to the doctor if she was still fussy the next day. The defense did not cross-examine Mrs. Butler at that time, but planned to bring her back during its case-in-chief.[5]

**{¶21}**  Detective Malone from the Scioto County Sheriff's Department testified that at SOMC on August 3, 2013, Appellant indicated that M.A. kicked him the day before, but at Children's Hospital on August 5, 2013, his story changed and at the Sheriff's Department on August 6, 2013, Appellant suggested three additional mechanisms of injury.

**{¶22}** Detective Malone testified when he learned M.A. had multiple fractures, he and Detective Jodi Conkel went to Children's Hospital to further investigate.  At Children's Hospital, the detectives spoke with Appellant and Mrs. Adkins, took photographs of M.A., and obtained her medical records.

**{¶23}**  Detective Malone testified on August 6, 2013, Appellant and Mrs. Adkins were asked to come to the sheriff's department for formal interviews.  The videotaped interviews of Appellant and his wife were played for the jury and admitted into evidence as Exhibits 15 and 18.  The interviews reveal Appellant and his wife gave conflicting statements of events and recollections from those presented at trial.

---

[5] The record indicates M.A. was placed with the Butlers for the next year while the case was pending trial.

{¶24} Appellant suggested in the video and at trial that M.A. was possibly hurt: (1) on her swing, (2) when her mother squeezed around her crib, or (3) by their dog.  Detective Malone's explicit testimony is that he was led to believe, from Appellant, that the other children were never left alone with M.A. and there was no indication the other siblings had hurt M.A. The relevant exchange from the Appellant's transcribed videotaped interview is as follows:

> Malone:  There's something definitely wrong because you didn't do it, you both said your kids didn't do it, she didn't do it, didn't see who did it but she's [the baby] never away from you guys.
>
> Appellant:  Well as far as I know of none of the girls done it but like you said, we raised them by our sight the whole time. (sic.)  The only time I wasn't by her sight was I laid her in her playpen while I went to go use the bathroom.  One of the other girls just sat and listened to make sure she wasn't going to start crying while I went to the bathroom.
>
> Malone:  Which one of them was that?
>
> Appellant:  My oldest one.
>
> Malone:  The nine year old.
>
> Appellant:  Yeah. Which I wasn't in the bathroom maybe but a minute.  I just went in there to take a pee and right back out. As a matter of fact I didn't even shut the door all the way, I left it cracked open.
>
> * * *

Appellant:    Well the other kids didn't do it.

* * *

Malone:       When you came out of the bathroom was she [the baby] screaming and crying?

Appellant:    Huh-um.

Malone:       Did you ask your other daughter what happened?

Appellant:    No, she [the baby] was laying there in the bed (inaudible) bright eyes as can be, making a bunch of weird looks on her face like she always does. She was waiving her arms wasn't crying or nothing. The only time she whimpered is when she kicked me in the mouth * * *.

{¶25} Detective Malone also testified that he interviewed Adkins and her interview was identified as Exhibit 18 and played for the jury. Similarly, on the video Adkins also stated they did not leave the other children alone with the baby. Initially, Adkins denied Appellant was ever violent or angry towards her. However, later in the video, she described several instances of violence. The transcript of her recorded interview also confirms this evidence. The evidence contained in her video will be set forth more fully below.

{¶26} Detective Malone concluded his testimony by opining that there was no evidence the mother, other children, or an unknown person had hurt M.A. Malone testified there was no evidence that M.A. had injuries or

abnormal cries or pains prior to the incident. Based on his investigation, Malone opined the injuries happened within the 24-hour period before August 2, 2013.

{¶27} Detective Jodi Conkel's testimony echoed Detective Malone's as to the investigation which took place at Children's Hospital. Conkel also learned there were acts of violence in the home which scared Adkins. Detective Conkel testified, based on her investigation, she never thought Adkins, the other children, or M.A. herself caused the injuries.

{¶28} The State's medical witnesses were all qualified as experts. All State's exhibits admitted into evidence were identified and authenticated. When the State rested, defense counsel made a Crim.R. 29 motion which was denied.

{¶29} Defense's case-in-chief began by recalling Aronessa Butler who testified that Appellant was a good dad, that his girls adored him, and that he took care of the home and attended their school activities. She also testified that M.A. had been exposed to other adults throughout the week. However, Mrs. Butler also admitted that Appellant had a temper and had once a made a threat about "driving a truck through Children's Services."

{¶30} Naomi Kinsel, a case worker with Scioto County Children's Services, testified both Appellant and his wife completed a parenting class.

Ms. Kinsel testified but for Appellant's felony charges and the no-contact orders, Appellant had satisfied all agency requirements for M.A. to be returned home.  On cross-examination, Ms. Kinsel admitted documenting a threat Appellant made about Children's Services, but testified she had no real fear about the threat.

{¶31}  Adkins testified she and Appellant had been married 9 years. They have five daughters, two of which are from their previous relationships.  Adkins testified M.A. was a planned pregnancy, and Appellant was very excited.  She only had 2 weeks of maternity leave, so Appellant stayed at home and took care of all the children.  He contributed to the household income by "junking."  She had never questioned his ability to parent.

{¶32}  Adkins testified she did not know how M.A. actually received her injuries on August 2, 2013.  She had no cause to believe Appellant struck M.A. or pinched her skin.  On August 2, 2013, Adkins had gone with her father and step-mother to get school supplies for the older girls.  About 2 - 2 ½ hours after they left, Appellant called her at dinner and said that he figured out why M.A. cried during diaper changes. Appellant told her that when he touched M.A.'s ankle, she screamed, and he saw redness and

swelling on her leg.  Adkins told Appellant to take a heat pack, wrap it in a towel, and place it on M.A.'s leg.  They left the restaurant shortly thereafter.

{¶33} When Adkins arrived home, M.A. was asleep on the bed. While Mrs. Butler earlier denied seeing swelling of the leg when they returned home, Adkins testified M.A.'s right leg was noticeably swollen. Mrs. Butler thought it was not serious and possibly M.A. had stubbed her leg.  Mrs. Butler advised taking M.A. to the emergency room if it was still swollen in the morning.

{¶34}  On cross-examination, Adkins admitted she did not notice anything wrong with M.A. during the first three weeks of her life and, specifically, before she left M.A. at home with Appellant on August 2, 2013. Adkins did not recall telling Detective Malone that severe screaming when they changed M.A.'s diaper had never occurred previously.  Adkins did not recall saying that the severe pain occurred just after she came home and Appellant had been watching the children.  She did not recall telling Detective Malone that M.A.'s scream was not her normal cry.

{¶35} By way of contrast to her trial testimony about the 2 ½ hour time frame, in her recorded interview, Adkins advised she was gone about 4 hours on the day M.A. was injured.  Furthermore, as to M.A.'s symptomatology, Adkins stated as follows in the recorded interview:

Malone:     So then you put down at the end of it [the statement] I notice when you touch [M.A.'s] right ankle she would scream as if it hurt severely.

Adkins:     Right, right.

Malone:     Did that happen any time before that?

Adkins:     No, no.

Malone:     So that severe pain was just when you came home from buying school supplies for the kids?

Adkins:     Right, right.

Malone:     Was the leg red like that when you left?

Adkins:     No, no.

* * *

Malone:     And to your knowledge he never left the child out of his sight?

Adkins:     No, not to my knowledge, no.

Malone:     Okay you brought her home and she seemed to be fine, correct?

Adkins:     Yeah, other than she always, ever since birth, when you pick their little ankles up to put the diaper on her, change her, she would squall like we were really hurting her but I just thought well she hates having her diaper changed. She's a baby. They don't like it. * * * I didn't think anything of it, you know, I mean it wasn't out of the normal cry of a baby that's getting her diaper changed. I just thought she was being fussy. She don't like it.

Malone:     So then on the 2nd of this month you had told me

that she had never cried like this before and her leg was real sore to the touch, tell me about what you told me there.* * * Should I say what got you to the point to where you took her to the ER?

Adkins:     Well, I came home Thursday night cause I went with my dad and his wife to go get school supplies for the other girls and I noticed that her right leg was a bit swelled and was bigger than her left leg and when you touched it she would scream like it hurt and I told my husband, I said I don't know what in the world is going on.  I don't know why she's, you know, why it's swelled, why she's crying like that * * *. So that's what prompted me to take her to the hospital.

Malone:     Well here's the thing between what you wrote here and what you told me at the ER and what you're telling me now is this was never an acute pain and she wasn't screaming and she wasn't like this before yesterday when she kicked him in the mouth, and now you're saying, yeah, she had that all along.

Adkins:     We. I mean I'm just trying to think of anything.  I mean they just, I questioned the doctor-

* * *

Malone:     Why didn't you tell me that when I left the ER?

Adkins:     I didn't think about it.  Honestly, I didn't.

Malone:     That's pretty important, if my kid has had pain since it's been born-

Adkins:     Well, I didn't know she was in pain though, I really didn't.  I just thought she didn't like having her diaper changed.  She's a baby.

{¶36} In the recorded interview, Adkins also testified to an incident involving Appellant's temper 5-6 years prior. Despite telling Detective Conkel in the recorded interview that Appellant grabbed a bedpost in anger and it "scared the crap out of her," at trial she testified that Appellant's action did not scare her at all. At trial she also explained when she was trying to leave, a bag of clothes was torn accidentally, not "shredded" by Appellant. In the interview she informed Appellant threatened to take the battery out of the car to keep her from leaving, but at trial explained he did so for her own safety.

{¶37} Lastly, Adkins testified she had not seen everyone who had come in contact with M.A. 100-percent of the time. She explained her statement to the social worker about "knowing they would be accused of child abuse," was made because she had heard every single time you take a baby in with something wrong with arms or legs, it is considered abuse and Children's Services is involved.

{¶38} Appellant also called his minor daughters to testify on his behalf. A.K., age 13, testified she had lived with Appellant since July 2014. She testified he is the "best father she could ever have." She had never seen Appellant being violent with her sisters or Adkins.

{¶39}   S.A., age 11, and B.A., age 9, both testified they had never seen their father be violent towards their mother, them, or M.A.  Both girls denied seeing Appellant hurt M.A.  Both girls testified that their parents argued, but they always took it into the bedroom.  B.A. also stated:  "He would never hurt her.  I know that.  But I ain't sure though because I don't really know if he would hurt her."  B.A. further testified she was "kind of afraid of them fighting because I've seen shows when these girls and guys get in fights and one of them kills them, and sometimes I do get kind of scared of them fighting because of that."   On cross-examination, both girls admitted they knew why they were in court and that "daddy" could go to prison.

{¶40}  At the end of the defense case-in-chief, Appellant testified.  He began by informing the jury that he had been around children all of his life, taking care of his sister's children when he was 14 or 15.[6]  He liked helping his wife by staying home with the children.

{¶41} Appellant testified on August 2, 2013, they had a cookout.  They invited his parents and brother.  Appellant's family arrived around 12:30 or 1:00 p.m.  However, they left and ended up not coming back.

---

[6] This included Levi Swords, his nephew, who also testified on behalf of Appellant.

Adkins went shopping with the Butlers later in the evening.  Appellant

testified they were only gone 1 ½ to 2 hours.

{¶42} Appellant testified he had laid M.A. on the bed and was rubbing

his beard up and down her legs and around her belly.  As he did, she kicked

her leg up, hitting him in the mouth.  Appellant saw blood on her foot.  He

touched M.A.'s ankle and she started crying.  Appellant called his wife and

told her M.A.'s ankle was hurt and swollen.  When Adkins came home they

discussed what to do.  He testified Mrs. Butler's recollection was wrong

because he asked "What do you think is wrong with her," not, "Do you think

her leg is broken?"

{¶43} The next afternoon they took M.A. to the emergency room.

They waited a day because as long as M.A. wasn't touched, she didn't cry.

Appellant had no reluctance to take her because of any child abuse.

Appellant denied hurting M.A. accidentally or intentionally.  He testified, as

did Adkins, that he believes the bruising on her abdomen is from the diaper

tape.  He testified she did not have one mark on her belly that day, but they

were using cheaper diapers with sticky tape and it stuck to her skin.

{¶44} Appellant testified Detective Malone kept pushing him to

provide explanations.  Appellant testified it is possible another family

member, friend, or one of M.A.'s sisters could have done it because in the

week-to-10 days prior to the incident, many other people besides Appellant had access to M.A. and held her, including his children, his brother and girlfriend, girlfriend's son, wife, landlord Joe Weeks, Nancy Fodge, Tara Gillum, his parents, nephew and niece. Appellant also testified S.A., his daughter, was going from room to room on August 2, 2013. And, because of the cookout, multiple people were in the home on August 2, 2013. Even nurses at Cabell Huntington hospital held M.A. while they visited his father.[7]

{¶45} Appellant admitted he has a temper. He could not remember the reason for his prior arguments with his wife. He denied grabbing a plastic bag of clothes from her and tearing it up. Appellant admitted he grabbed the bed post. He admitted he told her he would take the tires off the car or battery out to keep her from leaving. Appellant testified he never intended violence towards Children's Services and was just blowing off steam. He testified Mrs. Butler was a liar to say he asked her repeatedly if she thought M.A.'s leg was broken.

{¶46} In *State v. Swain,* 2002 WL 146204, (Jan. 23, 2002), this Court considered a sufficiency of the evidence argument, in the appeal of a conviction for child endangering. In *Swain, supra,* the defendant was

---

[7] Larry Adkins, Appellant's father, testified he did not see M.A. when she was first born because he was in Cabell Huntington Hospital. M.A. was taken to visit him there. His testimony indicates she would have been 3-4 days old at the time.

convicted of felonious assault and child endangerment after the minor child sustained hot water burns and multiple fractures of the wrists, ankles, and thigh within the first month of his life. At Swain's trial, the child's pediatrician testified that the child's injuries resulted from abuse. An emergency room doctor at Children's Hospital, Dr. Chapman, testified that the fractures the child sustained were "corner fractures or bucket handle fractures" caused by violent shaking.

{¶47} As in the case sub judice, in *Swain,* Dr. Chapman excluded vaginal delivery as the cause of the broken bones. She testified that because the child was delivered three weeks earlier, the x-rays would have revealed evidence of healing. Additionally, Dr. Chapman testified: "A non-moving three-week-old cannot sustain a femur fracture from his own activities."

{¶48} Furthermore, in *Swain,* the child's mother acknowledged that she did not initially tell the investigating detective that the child was with Swain's mother and sister for part of the day prior because "she did not realize it was important to do so." Similarly here, Appellant and his wife did not initially advise detectives other people had access to M.A. in the days and hours leading up to her symptoms. And, Adkins initially omitted mention of M.A.'s "severe screaming" since birth, as she "didn't think about it."

**{¶49}** On appeal, *Swain* cited *State v. Miley*, 114 Ohio App.3d 738, 684 N.E.2d 102 (4th Dist.1995), for the proposition that when the testimony in a child abuse case indicates that a defendant was one of two care givers, the evidence is insufficient to prove the elements of felony child endangering. In *Miley*, the appellant was convicted of felony child endangering after his six-day-old daughter suffered severe internal injuries. This court reversed Miley's convictions noting that the State presented no direct evidence that Miley abused the child, failed to protect her from abuse, or even knew of the abuse. We further found that the State's circumstantial evidence, that Miley and the child's mother were the only ones with access to the child, did not prove that Miley was the one who abused the child beyond a reasonable doubt. We observed at 745:

> "Reasonable doubt is present when jurors cannot say they are firmly convinced of the truth of the charge. R.C. 2901.05(D); *State v. Frazier* (1995), 73 Ohio St.3d 323, 330, 652 N.E.2d 1000, 1008. A fifty percent possibility does not satisfy the standard of beyond a reasonable doubt. Therefore, reasonable minds could only reach the conclusion that the State did not prove beyond a reasonable doubt that Miley abused Jessica."

**{¶50}** Swain argued the evidence in his case demonstrated that other relatives spent "significant time" with the injured child. However, this court disagreed. After recognizing the probative value of circumstantial evidence, we concluded in *Swain* at *8:

"[Sufficient evidence supports appellant's R.C. 2919.22(B) conviction.  Evidence exists that [Damien] was abused and that his injuries occurred on [December 16], the day appellant cared for [Damien.]  The doctors detected no injuries prior to December 17.  Appellant and [the child's mother] were together on December 15.  [The mother] stated that she did not see who caused [Damien's] injuries and that she did not cause the injuries.  Evidence exists that appellant was the sole caretaker during the period of time the abuse occurred. [Detective Lowe] testified that appellant stated he cared for [Damien] the day before the injuries were discovered.  Appellant did not inform the detective that [Damien] had been in anyone else's care. Although some evidence exists that appellant was not the sole caretaker during the period of time when the abuse occurred, once again the jury was free to reject appellant's other evidence.  *See State v. Sampsill* (June 29, 1998) Pickaway App. No. 97CA17, unreported. (internal citations omitted.)"

**{¶51}** In *Swain* at *9, we found *Miley* to be distinguishable in that:

"In *Miley,* the evidence revealed that at the time the abuse occurred, the child was in the care of more than one person.  In the case at bar, however, evidence exists that at the time of Damien's injuries, appellant was the sole caretaker. *See Sampsill*, 1998 WL 346680 (June 29, 1998).  As we noted above, evidence exists that the injuries occurred on December 16 and, despite appellant's claims to the contrary, that appellant was the sole caretaker that day and that appellant did not take the child to visit with relatives.  Additionally, appellant, like the defendant in *Sampsill*, was alone with the child for a substantial portion of the time-frame within which the injuries occurred."

**{¶52}**  In the case sub judice, we find sufficient evidence exists to support Appellant's R.C. 2919.22(B) conviction.  We find the analysis of the evidence more similar to that in *State v. Swain, supra.*  Here, Appellant has first argued that while the State argued M.A.'s injuries had to happen within

the 2-3 hours Appellant was essentially alone with M.A., the trial testimony from medical experts actually established that the injury could have taken place up to several days prior to the time M.A. was presented to the SOMC emergency room. However, the records and testimony show M.A. was born on July 10, 2013, had been examined at her pediatrician's office three times since birth where she had normal exams; showed no evidence of bruising; and no evidence of pain when her hips and legs were manipulated.

{¶53} Moreover, Adkins also testified that during the first three weeks of M.A.'s life and before she left to shop on August 2, 2013, she did not notice anything wrong with M.A. Mrs. Butler also noticed no swelling or bruising prior to the shopping trip. The only evidence that M.A. had any abnormal cries or pains regularly and prior to the incident came from her parents, and was conflicting, as discussed above.

{¶54} By all accounts, including Appellant's, M.A. first exhibited symptoms during the 2-3 hours after they left the home to go shopping. Appellant himself testified that on August 2, 2013 while the others were gone, he was rubbing the baby's stomach and legs with his beard when she kicked him, hitting his mouth. He touched her ankle and she started crying. Appellant himself testified that when he touched M.A.'s ankle, she screamed, and he saw redness and swelling on her leg.

{¶55} Dr. Bennington testified that the pain and swelling caused by fractures would begin immediately. Dr. Thackeray also testified symptoms of pain would appear within minutes, hours, or 1-2 days, but not weeks. All this evidence establishes that for the first three weeks of her life, and specifically between July 30, 2013 and August 2, 2013, roughly 4 days, M.A. did not exhibit symptoms or signs of injury.

{¶56} Here, it is true that in Dr. Bennington's cross-examination testimony he admits he could not pinpoint an exact time when the injuries occurred, and Dr. Thackeray's and Dr. Smith's cross-examinations, they generally agree that the injuries would have had to have been sustained "within" the 7-10 or 7-14 days of coming to the hospital. However, it appears the jury rejected Appellant's interpretation of the evidence as showing the injuries occurred within the later possible time frame and were more convinced by the medical evidence and documentation tending to show that the injuries occurred shortly after the manifestation of symptoms, which occurred during the 2-3 hour time frame Appellant was M.A.'s sole care taker. As in *Swain,* evidence exists that M.A.'s injuries occurred on a date certain, here August 2, 2013. We find sufficient evidence exists that M.A.'s injuries occurred on August 2, 2013.

{¶57} Appellant's next argument is that nearly two dozen people had access to M.A. during the 7 days prior to the incident, and that during those 7 days there were times when she was out of his care. Furthermore, none of them were investigated by the police or hospital staff. In all, Appellant suggested his brother and girlfriend, girlfriend's son, his landlord Joe Weeks, Nancy Fodge, Tara Gillum, his parents, his niece and nephew, and nurses at Cabell Huntington Hospital who held M.A. when she was only 3-4 days old all had access to M.A. Appellant even testifies to a cookout earlier in the day on August 2, 2013, which brought multiple people into the home. However, the State argued the evidence demonstrated Appellant was alone with M.A. a longer segment of time than anyone else, and just before the symptoms occurred.

{¶58} We begin by noting no one took M.A. to the emergency room until the next day, where Appellant explained to the treating providers that M.A. injured herself by kicking him. However, both Dr. Cheatham and Dr. Thackeray testified it was not possible for a child M.A.'s age to injure herself in that manner. Dr. Thackeray and Dr. Smith testified M.A.'s

injuries were caused by excessive force, shaking, or twisting. Dr. Bennington testified these injuries are also caused by blunt trauma.[8]

{¶59} Then at Children's Hospital, Appellant began to give other possible explanations for the injuries. At the Sheriff's office during the formal interview, Appellant gave additional explanations. As in *Swain,* Appellant and his wife did not initially inform the hospital staff or detectives that M.A. had been in anyone else's care but Appellant's. And even so, none of the possible explanations of possible injuries describe events of excessive force or blunt trauma.

{¶60} Importantly, none of these explanations contain any specific dates as to when the incidents possibly causing injury occurred. None of the explanations regarding injury on the swing, the door, the crib, or the dog are specified as to date. Furthermore, the evidence demonstrates that none of these possible mechanisms of injury apparently occurred during the 2-3 hours when M.A. was alone with her father and just before she experienced symptoms. And while Appellant indicated his wife was kicked while she was pregnant with M.A. and that M.A. was possibly injured during delivery, Dr. Thackeray testified regarding the birth records and video and testified he saw nothing to indicate injury during delivery.

---

[8] Appellant did not dispute the diagnosis of multiple fractures or the theory that the fractures were caused by excessive trauma.

{¶61} In their recorded statements, Appellant and his wife specifically denied the other children had hurt M.A. and excluded them as a cause of injury. However, at trial, Appellant elicited his minor daughters' testimony. B.A. testified that she might have accidentally hurt M.A. while she was playing one day, although she really doesn't play "rough." When asked if one of her sisters could have hurt the baby, B.A. responded: "I don't know. H.A., she's a little rough." Dr. Smith testified the fractures would not be caused by ordinary play or handling of M.A. Again, the children's testimony about possible accidental injury while playing was vague, was not qualified as to any specific date in time, and was not specified to be within the 2-3 hours Appellant was the sole caretaker. And, this testimony contrasts to Appellant's initial vehement denial that the other children hurt M.A.

{¶62} As in *Swain*, we find evidence exists that: (1) Appellant was the sole caretaker of M.A. when the injuries occurred; and (2) that Appellant was alone with M.A. a substantial portion of the time frame when injuries occurred. The jury was free to believe or accept all the testimony presented from the medical experts, the detectives, Appellant and his wife, and the minor children. Regarding credibility, we are mindful that:

> "The trier of fact, in this case the jury, has the primary
> responsibility for determining the credibility of the witnesses

and the relative weight to be given to each of their testimonies. *State v. Williams,* 10th Dist. Franklin No. 91-AP-653,1992 WL 42815, (March 5, 1992)*, citing State v. DeHass*, 10 Ohio St.2d 230, 227 N.E. 212, paragraph 1 of the syllabus (1967)."

{¶63} Finally, Appellant cites the testimony of every witness who had personal knowledge of him and his interaction with his wife and children as being convinced that Appellant could not and did not harm his child. This argument also, necessarily, depends upon credibility determinations. Appellant relies on the following remaining defense testimony summarized here:

> 1) Todd Riddle, Joe Weeks, Tim Berry (friends and neighbors) and Levi Swords (Appellant's nephew whom he helped raise) testified Appellant was a good dad, and they had not seen violence in the Adkins' home.
>
> 2) Betty Cattee and Carolyn Moore testified Appellant was a great parent.
>
> 3) Nancy Fodge, a friend, testified she never observed violence between Appellant and his family.
>
> 4) Larry Adkins, Appellant's father, testified he had never observed violence with Appellant's family.

{¶64}While Appellant emphasizes the favorable testimony regarding his parenting skills and interactions, the jury also heard Todd Riddle, Joe Weeks, Tim Berry, Levi Swords, and Nancy Fodge admit that they did not know what went on behind closed doors and were not present on August 2, 2013 when M.A. was injured. Betty Cattee, Carolyn Moore, and Nancy

Scott (Appellant's sister) admitted they were not present on August 2, 2013. Nancy Scott, along with Aronessa Butler and even Adkins, admitted Appellant had a temper. Appellant's father Larry Adkins also admitted he was not present on August 2, 2013.

{¶65} Regarding M.A.'s "fussiness" during diaper changes, Adkins testified on direct that M.A. had been "fussy since birth like she'd scream when we changed her diaper for no apparent reason. I just thought she didn't like diaper changes." However in her recorded statement which the jury viewed, she told Detective Malone she initially omitted the information at the hospital about the severe screaming since birth, initially because she just didn't "think about it." In her trial testimony, Adkins also downplayed Appellant's tendency towards violence, while the interview the jury heard contained statements including "There was this time we got into a fight and he scared me"; "He got mad and I don't know if he did it to keep from hitting me or something anyway he shook the metal poles real hard, and it scared the crap out of me"; and "If I had just taken her with me none of this never would have happened."

{¶66} Appellant also damaged his credibility with his testimony about a cookout earlier in the day on August 2, 2013 before his wife and the Butlers went shopping. In Appellant's videotaped statement, Detective

Conkel advised Appellant that one of his daughters said that Appellant had

left them to go to a neighbors' briefly on August 2, 2013.   Appellant

specifically denied leaving M.A. alone on August 2, 2013.  This exchange

followed:

> Conkel:      They said that they, she said that she left the baby
>              in the bassinet and locked the door behind you,
>              that you were going to Joe's to borrow a hose to
>              fill up the pool.  You left on the four wheeler.
>
> Appellant:   (Inaudible)
>
> Conkel:      That's what she told me.
>
> Appellant:   When I went over, I went over to my landlord's to
>              get us a hose to fill up a little kiddie pool for them,
>              my wife was still pregnant at the time.  My wife
>              was there, who else was there, I think my brother
>              and his girlfriend was there cause we had a cook
>              out that day, and my mom and dad came down
>              * * *.

{¶67} Appellant's recollection in his recorded interview about a

cookout is somewhat confusing.  Whatever is to be construed about a

cookout taking place on a different day or on August 2, 2013, Appellant

testified about an event bringing additional people into the household which

no other defense witness recalled or found important to mention at trial.  We

are constrained to give great deference to the jury's determination of

credibility, given that the jury was in the best position to see and hear

Appellant and all the prosecution and defense witnesses, and to note their voice inflections and demeanor.

{¶68}We conclude in viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could find all of the essential elements of child endangering proven beyond a reasonable doubt. The jury obviously found the evidence against Appellant compelling. The direct evidence showed M.A. had no symptoms of multiple fractures or bruising during the first 24 days of her life. The circumstantial evidence demonstrates Appellant and his wife initially excluded all other persons, and Appellant was M.A.'s sole caretaker for 2-3 hours on August 2, 2013, immediately prior to the manifestation of symptoms.

{¶69} Having found that sufficient evidence exists to support Appellant's conviction, we further find his conviction not to be against the manifest weight of the evidence. In *Wickersham, supra,* at ¶ 31, we observed:

> "A jury, as the finder of fact and the sole judge of the weight of the evidence and the credibility of the witnesses, may believe or disbelieve all, part, or none of a witness's testimony. *State v. Proby,* 10th Dist. Franklin No. 15AP-1067, 2015-Ohio-3364, ¶ 42, quoting *State v. Antill,* 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964). A conviction is not against the manifest weight of the evidence because the jury believed the state's version of events over the appellant's version. *Id.* at ¶ 11, citing *State v. Houston,* 10th Dist. Franklin No. 04AP-875, 2005-Ohio-449,

¶ 38. A reviewing court must give great deference to the jury's determination of witness credibility. *Id.,* citing *State v. Chandler,* 10th Dist. Franklin No. 05AP-415, 2006-Ohio-2070, ¶ 19."

{¶70} We also observed in *Wickersham, supra:*

" 'While the jury may take note of inconsistencies and resolve or discount them accordingly, * * * such inconsistences do not render defendant's conviction against the manifest weight or sufficiency of the evidence.' " *Proby, supra,* at ¶ 42, quoting *State v. Gullick,* 10th Dist. Franklin No. 13AP-317, 2014-Ohio-1642, ¶ 10, quoting *State v. Nivens,* 10th Dist. Franklin No. 95APA09-1236 (May 28, 1996).

{¶71}  Here, the jury obviously believed the State's version and construal of the events, took note of inconsistencies in the evidence, and resolved them in favor of the State.  Despite the fact that Appellant's conviction is based in part on circumstantial evidence, we do not find this to be the exceptional case in which the evidence weighs heavily against the conviction.  For the foregoing reasons, we find Appellant's sole assignment of error is without merit and we affirm the judgment of the trial court.

**JUDGMENT AFFIRMED.**

Harsha, J., concurring:

{¶72} I concur in the judgment and opinion overruling Adkins's assignment of error and affirming his conviction for child endangering. I agree with the principal opinion that this case is distinguishable from our decision in *State v. Miley*, 114 Ohio App.3d 738, 684 N.E.2d 102 (1996), in which we held that circumstantial evidence that the defendant and his infant daughter's mother were the only persons who cared for and had access to the infant during the time she suffered severe internal injuries was insufficient to prove the defendant's guilt beyond a reasonable doubt.

{¶73} I concurred in judgment only in that case, and *Miley* has been largely confined to its facts and distinguished by this and other appellate courts since that time. For example, in *State v. Haley*, 12th Dist. No. CA2012-10-211, 2013-Ohio-4123, at ¶ 11, the Twelfth District Court of Appeals specifically determined that "since its release, numerous courts throughout the state, including this court, have found *Miley* provides limited precedential value due to its highly distinguishable facts." Similarly, in *State v. Hall*, 11th Dist. Trumbull No. 2011-T-0115, 2012-Ohio-4336, at ¶ 17, the Eleventh District Court of Appeals acknowledged the "limited precedential value of *Miley*."

**{¶74}** The state established a specific period of time when the abuse occurred here-during the 2 ½ hour period that Christi and her parents left the child in Adkins's care—even Christi and Adkins's statements to police and testimony suggested that this is the period when the injuries occurred. Consequently, *Miley*, where there was no evidence that the defendant was with the child during the injury, is readily distinguishable. *See State v. Meadows*, 4th Dist. No. 99CA2651, 2001 WL 803822 (Feb. 12, 2001). Significantly, Adkins himself does not even cite or rely on *Miley* in his short brief.

**{¶75}** Therefore, based on the state's evidence, which the jury was free to credit, there was sufficient evidence to support Adkins's child-endangering conviction, and the jury did not clearly lose its way in resolving conflicts in the testimony to convict him. The principal opinion thus correctly overrules Adkins's assignment of error and affirms the conviction.

Hoover, J., dissenting:

**{¶76}** I respectfully dissent from the lead opinion.

**{¶77}** I would sustain Michael Adkins's first assignment of error and conclude that the State of Ohio failed to provide sufficient evidence to sustain a verdict against him. I would then find the manifest weight of the evidence argument moot.

**{¶78}** In *State v. Dillon*, 4th Dist. Washington No. 11CA31, 2013-Ohio-614, this Court reversed a child endangering conviction based on a sufficiency of the evidence argument. In that case, this Court set forth the standard of review when reviewing the sufficiency of the evidence to support a criminal conviction:

> "An appellate court's function when reviewing the
> sufficiency of the evidence to support a criminal conviction is
> to examine the evidence admitted at trial to determine whether
> such evidence, if believed, would convince the average mind of
> the defendant's guilt beyond a reasonable doubt. The relevant
> inquiry is whether, after viewing the evidence in a light most
> favorable to the prosecution, any rational trier of fact could
> have found the essential elements of the crime proven beyond a
> reasonable doubt." *State v. Jenks,* 61 Ohio St.3d 259, 574

N.E.2d 492 (1991), paragraph two of the syllabus (superseded by statute and constitutional amendment on other grounds).

This test raises a question of law and does not allow the appellate court to weigh the evidence. *State v. Osman,* 4th Dist. No. 09CA36, 2011–Ohio–4626, ¶ 39. A sufficiency of the evidence challenge tests whether the state's case is legally adequate to go to a jury in that it contains prima facie evidence of all of the elements of the charged offense. *See Portsmouth v. Wrage,* 4th Dist. No. 08CA3237, 2009–Ohio–3390, ¶ 36.

A conviction that is based on legally insufficient evidence constitutes a denial of due process. *State v. Thompkins,* 78 Ohio St.3d 380, 386–387, 678 N.E.2d 541 (1997). And the Double Jeopardy Clause precludes retrial once the reviewing court has found the evidence legally insufficient to support a conviction. *Tibbs v. Florida,* 457 U.S. 31, 40–41, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). *See also Thompkins* at 387.

*Id.* at ¶¶ 8-10.

**{¶79}** In this case, the State presented insufficient evidence to sustain the verdict against Michael Adkins.

**{¶80}** The first witness presented by the State was Dr. Steven Keys, a physician at Christ Care Pediatrics. This witness provided no evidence that Michael Adkins abused M.A.[9] He did provide testimony that the child, M.A., was seen by a nurse practitioner at his office on July 30, 2013. On that date, when M.A. was 20 days old, a hip manipulation was done; and no bruising or pain was noted.

**{¶81}** The second witness was Dr. Jason Cheatham. Dr. Cheatham was the emergency physician at Southern Ohio Medical Center. Dr. Cheatham treated M.A. on August 3, 2013, when she was 24 days old. When Dr. Cheatham examined M.A., he "did not see any obvious deformity, swelling, bruising." (Tr. page 72, line 24 and page 73, line 1.) Dr. Cheatham also testified that M.A. did not exhibit any signs of disturbance or pain. (Tr. page 73, lines 3-5.) Dr. Cheatham did not talk with Michael Adkins. (Tr. page 80, lines 17-19 and page 81, lines 1-4.) Dr. Cheatham testified that he did not determine the cause of the injuries.

> Q. And you also were not part of an investigation to determine who was the cause of these injuries, correct, other than taking some kind of in put history? [sic]
>
> A. Exactly.

---

[9] Any minor children that are involved in this case shall be referred to with initials only.

Q. Okay, so you're not able to purport a person that caused these injuries or anything that would have caused these injuries?

A. Correct, we identify what the concerning findings and then we refer that child to what we consider the experts in that field.

(Tr. pages 83-84.)

{¶82} The next witness that the State called was Dr. Nathan Bennington. Dr. Bennington is a diagnostic radiologist at Southern Ohio Medical Center. Dr. Bennington testified that the fractures that M.A. sustained were "highly suggestive of non-accidental trauma or abuse." (Tr. page 95, lines 19-20.) However, Dr. Bennington provided no testimony or evidence as to who or what caused the injuries to M.A.

{¶83} The State then called Dr. Sally Smith to testify. Dr. Smith is a pediatric radiologist at Nationwide Children's Hospital in Columbus, Ohio. Dr. Smith dated M.A.'s injuries as occurring anywhere from 7-14 days prior to August 3, 2013, when the images were taken of her injuries. However, this time frame is inconsistent with the testimony that M.A. had no bruising or pain when the hip manipulation was performed by the nurse practitioner on July 30, 2013. Specifically, Dr. Smith testified as follows:

Q. Is there any way Doctor, that you can date these injuries?

A. Yes, I can't say a specific day, but I can give a time frame

that these fractures occurred.

Q. Okay.

A. So when a fracture, when a corner fracture looks just like a

little fleck of bone off of the corner it's more likely to have

occurred within the last 7 to 14 days.

(Tr. page 123, lines 23-24 and page 124, lines 1-7.)

{¶84} Dr. Smith further testified that she did not know

necessarily that M.A. was abused.

Q. * * * Do you know necessarily that this child was abused?

A. I didn't know, no.

(Tr. page 134, lines 4-6.)

{¶85} Dr. Smith was also unable to establish any causation

between M.A.'s injuries and any conduct or inaction of Adkins.

Q. Right, but you're not able to say who did it, when exactly it

occurred, or how, what specific actions, you can only speculate

actions that would have occurred, correct?

A. Correct.

(Tr. page 138, lines 3-7.)

{¶86} The next witness that the State called to testify was Jennifer Estep. Ms. Estep is a social worker at Southern Ohio Medical Center. Ms. Estep testified that she heard Christi Adkins ("Christi") state: "I knew you would think we abused our daughter." (Tr. pages 151-152.) But, Ms. Estep also testified that the parents were "very cooperative" when she spoke to them. (Tr. page 156, line 10.) She also testified that she had not had any dealings with the Adkins family in the past. (Tr. page 157, lines 17-19.) Ultimately, Ms. Estep did not provide any testimony with respect to the causation of M.A.'s injuries. Ms. Estep did not provide any direct evidence linking Michael Adkins to M.A.'s injuries.

{¶87} The State's next witness was Aronessa Butler; the maternal step-grandmother of M.A. Mrs. Butler testified that she had handled M.A. on August 2, 2013, before she and Christi left for "some adult time." (Tr. page 165, line 11.) Mrs. Butler observed that when she lifted M.A.'s legs, M.A. fussed. (Tr. page 168, line 1.) After handling M.A., Mrs. Butler left with Christi to go shopping; and they went to eat. Mrs. Butler testified that the people that were left at home were M.A., B.A., H.A., and Mike. (Tr. page 168, lines 23-34.) Mrs. Butler added that S.A. came home sometime after she and Christi had already left. (Tr. page 169, lines 8-9.) Therefore, M.A. was left at home with her father and three sisters.

{¶88} Mrs. Butler testified that after shopping and eating, she and Christi returned to the Adkins's home. Mrs. Butler and Mr. Butler, Christi's father, were at the Adkins's home long enough for Mr. Butler to fall asleep on the couch. (Tr. page 171, lines 22-23.) Christi then asked Mrs. Butler to "come back here and take a look" at M.A. (Tr. page 172, lines 1-2.) Christi and Michael Adkins explained that M.A. had kicked her father in the mouth. Mrs. Butler testified that she "took her diaper off, stripped her down * * * looked over her heels, looked over everything." (Tr. page 172, lines 10-12.) Mrs. Butler thought M.A. "looked all right." (Tr. page 172, line 13.) She did not notice any swelling in her leg but she did notice a red mark on her abdomen. (Tr. page 172, line 13-14.) Mrs. Butler testified that Christi and Michael Adkins explained the red mark as being caused by the diaper. (Tr. page 172, lines 15-16.)

> Q. Okay, okay, and so at that point you noticed some marks on her belly?
>
> A. I noticed one on the right side. It just looked like, it really looked a straight pin mark, I mean it was just a red line so you know they held the diaper strap us, showed me, it was like "oh okay". [sic] I didn't think anything of it and he'd asked me a couple of times "do you think her leg is broken". I said "no, I

don't really think so". I said "you know if she's still fussy in the morning I'd take her to the doctor, maybe she just stoved her, when she kicked she stoved her foot, her ankle, she's just hurting a little bit." And I said "I really don't think it's anything to be concerned with". I said "call me tomorrow and let me know how she's doing".

(Tr. page 173, lines 13-24 and page 174, lines 1-2.) Mrs. Butler provided no testimony regarding the cause of M.A.'s injuries.

{¶89} The State's next witness was Detective Dan Malone ("Malone"). Malone is a detective at the Scioto County Sheriff's Office who took statements from both Christi and Michael Adkins. Malone traveled to Columbus, Ohio, to Nationwide Children's Hospital. Malone testified that at the hospital, Michael Adkins told him that "he possibly was, or he was tickling his child, was leaning over her and was tickling her belly with his beard and the child had kicked him in the tooth and loosened his tooth and possibly injured her leg that way." (Tr. page 187, lines 20-24.) Malone then interviewed Michael Adkins on a later date, August 8, 2013, at the Scioto County Sheriff's Office. Malone testified that Christi and Michael Adkins both stated "that the children never have time alone with this baby without

one of them being present." (Tr. page 195, lines 3-5.) Malone's interview of Michael Adkins was videotaped.

{¶90} When questioned multiple times regarding how the child could have been injured, Michael Adkins presented different theories such as: 1) the kick to his mouth; 2) injury occurring on a swing; 3) bumping the child in the middle of the night; 4) the crib causing the injury; and 5) Christi Adkins squeezing the baby through small places. These explanations were presented after Malone had asked Michael Adkins multiple times, "can you think of anything?" (Tr. page 220, lines 14-18.)

> Q. And I think you asked that multiple times, can you think of anything else and it appeared to me, and agree or disagree, that he was trying to think of anything else and he was just throwing things out there that he genuinely and honestly, although he may not have thought they were the cause of the actual injuries, but just how the baby might have been hurt, period.
>
> A. Correct.

(Tr. page 220, lines 18-24 and page 221, line 1.)

{¶91} Malone testified that Michael Adkins denied intentionally harming the child but said there might have been the possibility of an accident. (Tr. page 210, lines 9-10.) Malone testified that during the

interview Michael Adkins was calm and cool. Michael Adkins did not admit to Malone that he harmed M.A.

{¶92}  Malone also interviewed Christi Adkins. Malone testified that Christi was "very distraught, very upset the whole time" during her interview. Christi advised Malone that she did not hurt M.A. (Tr. page 213, line 7.) Malone testified that Christi noticed that M.A.'s leg was swollen "[w]hen she came home from clothes shopping for the kids for school." (Tr. page 212, lines 19-20.) However, this is inconsistent with Mrs. Butler's testimony that she did not notice any swelling. (Tr. page 172, lines 13-14.)

{¶93}  The prosecutor then asked Malone the following series of questions:

Q. Okay, was there any evidence that the mother ever injured the child?

A. No.

Q. Was there any evidence that the other children ever injured the child?

A. No.

Q. Was there any evidence that some unknown person injured the child?

A. No.

(Tr. page 216, lines 3-11.) The prosecutor did not ask Malone "if there was any evidence that Michael Adkins ever injured the child?" Instead, the prosecutor asked Malone, "Based on your investigation who had the opportunity to injure this child?" Malone responded, "Michael Adkins." (Tr. page 216, line 14.) This is a much different question than "Was there any evidence that Michael Adkins injured the child?" Malone also failed to present any evidence that Michael Adkins injured the child.

{¶94} The State then called Detective Jodi Conkel ("Conkel") to testify. Conkel is a detective with the Scioto County Sheriff's Office. Conkel went with Malone to Nationwide Children's Hospital on August 5, 2013; and she also assisted in interviews on August 6, 2013. (Tr. page 238, lines 20-22 and page 239, line 1.) Conkel did testify that some of the children were at the home at the time Michael Adkins was taking care of the child. (Tr. page 252, lines 1-5.) Conkel did not provide any evidence that Michael Adkins injured the child.

{¶95} Dr. Jonathan Thackeray was the next witness for the State. Dr. Thackeray is the medical director of the Center for Family Safety and Healing and the chief of the Division of Child and Family Advocacy at Nationwide Children's Hospital. Dr. Thackeray testified to M.A.'s injuries and other "irregularities." (Tr. page 267, lines 16-24 and page 268, lines 1-

5.) Dr. Thackeray also testified that " 'mother states that she and the other kids were home' at the time that the injury would have occurred." (Tr. page 278, lines 17-19.) Dr. Thackeray's ultimate medical opinion was given.

> Q. It's your medical opinion here today that these injuries could not have resulted in any accidental explanation that you were given by the defendant, is that right?
>
> A. That's correct.

(Tr. page 280, lines 8-12.)

{¶96} On cross-examination, Dr. Thackeray admitted that he could not determine a cause of the bruising. (Tr. page 284, lines 22-24.) Dr. Thackeray also testified that the injuries would have had to be sustained within the last 7 to 10 days before coming into the hospital. (Tr. page 288, lines 4-8.) Furthermore, Dr. Thackeray agreed with defense counsel that swelling does not always necessarily accompany a fracture. (Tr. page 288, lines 18-20.) Dr. Thackeray answered the following questions:

> Q. * * * Doctor, you yourself are unable to say how and when these injuries actually occurred other than the general mechanism of a twisting or a pulling action, correct?
>
> A. That's correct.

Q. You aren't able to testify before this Court today and say you know the exact mechanism specifically or at what minute and hour it occurred, can you?

A. I cannot say that. That's true.

Q. And you most certainly cannot say who caused it, correct?

A. That's correct.

(Tr. page 290, lines 17-24 and page 291, lines 1-4.)

{¶97} On re-direct examination, Dr. Thackeray testified that the parents (Christi and Michael Adkins) indicated that they were the only ones to care for M.A. (Tr. page 292, lines 12-14.) Dr. Thackeray did not believe that the other children caused the injuries to M.A. "based more on the fact that the caregivers were clear, that they don't allow the baby to be alone with the siblings." (Tr. page 293, lines 4-6.)

{¶98} The last witness in the State's case in chief was Captain David Hall ("Hall"). Hall was the captain in charge of the detectives unit of the Scioto County Sheriff's Office. Hall testified about a statement made to him by Michael Adkins.

Q. What was his statement?

A. His statement was he wasn't sure if he'd done it or not. If he

did do it, he believed it was accidental, but then said he

couldn't remember if he did it or not.

(Tr. page 299, lines 19-22.) Hall was questioned on cross-examination as

follows:

Q. My question is he did not admit to intentionally harming this

child in any form or any fashion, yes or not? [sic]

A. Not in those words, no.

(Tr. page 300, lines 17-20.)

{¶99} With respect to all the witnesses that were called to testify in

the State's case in chief, none of the witnesses produced any direct evidence

that Michael Adkins harmed M.A. Likewise, all of the witnesses who

testified in Michael Adkins's case in chief failed to produce any direct

evidence that Michael Adkins harmed M.A.

{¶100} The first defense witness, Mrs. Butler, had testified in the

State's case in chief also. When she testified in Michael Adkins's case in

chief, she testified on cross-examination that when Christi was at work,

Michael Adkins would be the primary caregiver. When questioned about

Christi's work schedule, Mrs. Butler testified that Christi worked five hours

a day, two to three days per week.

Q. So maybe fifteen hours a week?

A. Yeah, that sounds about right.

Q. And when she wasn't at work where was she?

A. She was at home.

Q. With the children?

A. Yes.

Q. What did she do at home when she was with the children?

A. Everything a typical mom does.

Q. So she took over the primary caregiver role?

A. Yes.

(Tr. page 330, lines 1-11.) Thus, Mrs. Butler, Christi's step-mother, explained that Christi took over the primary caregiver role for the children when she was not working the 10 to 15 hours per week. Mrs. Butler also provided evidence that Christi did not believe that Michael Adkins injured M.A. (Tr. page 344, lines 8-9.)

{¶101} The second defense witness was Naomi Kinsel. Ms. Kinsel was the "ongoing case worker" for the Scioto County Children Services. Ms. Kinsel testified that Michael Adkins completed the parenting program as requested and that his interaction with M.A. was always appropriate. Ms. Kinsel did acknowledge that she received a notification about Michael

Adkins saying he would drive a truck into the Children Services; but she also testified that this did not cause her any fear or did not cause her to stop or terminate the supervised visits between Michael Adkins and M.A. Conclusively, Ms. Kinsel provided no evidence that Michael Adkins injured M.A.

> Q. Okay. In this case did you know who potentially caused the abuse?
>
> A. No.

(Tr. page 365, lines 23-25.)

{¶102} Todd Riddle was the third witness called by the defense. Mr. Riddle was Michael Adkins's neighbor and friend. Mr. Riddle provided no testimony regarding causation of M.A.'s injuries.

> Q. Okay. So you wouldn't know what goes on behind closed doors at this defendant's house?
>
> A No.
>
> Q. Whether there's any violence or aggression.
>
> A. No.
>
> Q. Or child abuse, for that matter?
>
> A. No.

(Tr. page 376, lines 5-11.)

{¶103}  The defense next called Joseph David Weeks as its fourth witness. Mr. Weeks was the Adkins's landlord. Mr. Weeks was familiar with Michael Adkins and the Adkins family. Mr. Weeks testified that: "Mike is a very good dad and I don't believe Mike could ever hurt a kid." (Tr. page 381, lines 20-21.) Mr. Weeks also failed to provide any evidence as to the causation of M.A.'s injuries.

{¶104}  The fifth witness for the defense was Levi Swords. Mr. Swords is the nephew of Michael Adkins. (Tr. page 387, line 3.) Mr. Swords testified about his relationship with Michael Adkins and about his view of Michael Adkins's relationship with his children.

Q. Okay. You know him as an uncle, but how is he has a dad?

[sic]

A. My opinion, he's a great father.

Q. Okay. Have you ever witnessed any behavior between him and his children that would cause you some concern?

A. No.

(Tr. page 391, lines 5-10.) Mr. Swords also testified that Christi helped take care of the baby.

Q. She helped take care of the baby?

A. Um-huh.

Q. She do a lot of the changing and the work when she wasn't

at work?

* * *

A. Yeah, I mean when she wasn't at work, yeah, she did a lot

with the baby.

(Tr. page 405, lines 22-25 and page 406, lines 4-5.) Ultimately, Mr. Swords

did not testify regarding the causation of M.A.'s injuries either.

{¶105} The next defense witness was Nancy Scott. Nancy Scott is

Michael Adkins's sister. Ms. Scott provided no evidence as to causation of

Michelle's injuries.

Q. Ma'am, can you tell the jury what your understanding is

about what happened to the baby, what caused the injury?

A. I really have no idea what caused the injury.

(Tr. page 417, lines 19-21.)

{¶106} Christi Adkins next testified for the defense. Christi explained

that she and Michael Adkins shared in the responsibilities of parenting. (Tr.

page 441, lines 9-10 and page 443, lines 1-4.) Christi testified that she did

not have any concerns about Michael Adkins staying home and taking care

of M.A. along with the other children. (Tr. page 443, lines 8-12.) Christi also

testified about the arguments that she had with Michael Adkins.

Q. Okay. In either one of those incidents, other than scaring you, did you ever believe he was going to physically hurt you?

A. No.

Q. Okay. Did you believe that he was going to physically hurt one of the children.

A. No. He would never.

Q. Okay. Were there any other incidents that you've not revealed that have ever caused you concern that he would ever hit you or the children?

A. No.

(Tr. page 444, lines 23-25 and page 445, lines 1-8.)

{¶107} With respect to the actual date that M.A. received the fractures, Christi could not testify to a date certain.

Q. Okay. Are you for certain that [August 2, 2013] is the day that M.A. received the fractures to her legs?

A. I don't know when it happened. I can't tell you that.

Q. Okay.

A. Because I really don't know what happened.

(Tr. page 452, lines 6-10.) Christi also explained to the jury that with respect to her oldest daughter, S.A., Christi had caused the same type of markings that occurred with M.A.

Q. Okay. No theory by the hospital and how they were caused?

A. No. They asked me about the bruises while I was at Children's Hospital and I said I hadn't noticed them before but, you know, Michael had told me that the diaper tape had got her, which I see as a relevant explanation because, like I said, I did it accidently [sic] to my oldest daughter.

Q. When you did that to your oldest daughter, did she have the same type of markings on her body?

A. Yes.

(Tr. page 454, lines 5-14.)

{¶108} Christi testified regarding her thoughts on whether or not Michael Adkins caused M.A.'s injuries.

Q. Okay. When you got that phone call while you were eating about M.A., did you have a suspicion that Mike abused or caused leg fractures to M.A.'s legs?

A. No.

Q. Do you to this day believe that Michael fractured Baby

M.A.'s legs?

A. No.

(Tr. page 458, lines 8-14.) * * *

Q. Okay. Do you believe that Michael whooped or spanked

M.A. in an aggressive manner?

A. No.

(Tr. page 463, lines 5-7.) * * *

Q. Do you believe that he caused these injuries?

A. No, I don't.

(Tr. page 545, lines 6-7.)

{¶109} Christi also testified about the lack of treatment that M.A. received for her injuries.

Q. Okay. You said there were no split, [sic] no casts?

A. No, none.

Q. Okay. What about in regards to the bruising or the injuries

on her abdomen?

A. They did nothing.

Q. Okay. Did the [sic] put ointment on them?

A. No.

Q. Did they give her any medication that you are aware of?

A. No. They didn't even send her home with any.

(Tr. page 468, lines 3-12.)

{¶110} Christi further testified about M.A.'s prognosis. The health care providers said "that it would heal on its own in about two to three weeks." (Tr. page 469, lines 3-4.) Christi testified that M.A. is fine.

Q. Okay. How does M.A. appear today?

A. She's fine. She walks, she talks.

Q. Does she walk as an average child would?

A. Oh yes. She's all over the place, into everything.

Q. Does she have any permanent disability based on these leg fractures?

A. Not that I can tell. I'm not a doctor but not that I can tell.

Q. Does she appear as if she walks without discomfort?

* * *

A. Oh yeah, she has no trouble walking at all.

(Tr. page 471, lines 13-24.)

{¶111} On cross-examination, Christi agreed that she was with the "kids a hundred percent of the time" when she was not at work. (Tr. page 538, lines 3-6.) However, Christi denied hurting M.A.; (Tr. page 528, lines

3-4); and she denied that the other children hurt M.A. (Tr. page 537, lines 8-9.) Christi also provided no testimony or direct evidence that Michael Adkins caused the injuries to M.A.

{¶112}  A.K. was the defense's next witness. A.K. is Michael Adkins's oldest daughter from a previous relationship. At the time of the trial, A.K. was 13 years old and a student at Portsmouth West Middle School. A.K. provided no evidence that Michael Adkins caused the injuries to M.A.

{¶113}  S.A. testified for the defense also. S.A. is the biological daughter of Christi and adopted daughter of Michael Adkins. S.A. also failed to provide any evidence that Michael Adkins injured M.A.

Q. Okay. Are you able to say how Baby M.A. got hurt?

A. No.

(Tr. page 562, lines 11-12.)

{¶114}  B.A. testified next for the defense. B.A. is also the daughter of Christi and Michael Adkins. At the time of the trial, B.A. was in the fourth grade at Portsmouth West Elementary School. B.A. provided testimony regarding the time when Christi left with Mrs. Butler for their "adult time."

Q. Okay. Were you around him when he was taking care of

Baby M.A.?

A. I was around him the whole time.

Q. Okay. And how do you remember that you were around him the whole time?

A. Well, there's a bathroom beside his room which is like practically in his room. I went in there while he was with M.A. and there's a mirror on the bathroom door and it was open and I could see him through it and I didn't see him even lay a figure [sic] on her.

(Tr. page 573, lines 23-25 and page 574, lines 1-7.)  B.A. testified that her father, Michael Adkins, did not hurt M.A.

Q. Okay. Okay. Did you see your dad pull M.A.'s legs to where he was being mean to her or hurting her in any way?

A. No.

Q. Did you see her—did you see him hit her or pinch her?

A. No.

Q. Okay. Did anything—did anything that your dad did with M.A. on that day cause you to question his ability to take care of her?

A. No.

(Tr. page 577, lines 7-16.)

{¶115}  In addition, the State elicited testimony from B.A. that she may have been playing too rough with M.A. and that H.A. is a little rough.

Q. Okay. Did you do something too rough with the baby?

A. I never tried to do anything rough with her but if I accidently [sic] been too rough, I might have accidently [sic] hurt her while I was playing with her one day.

* * *

Q. Yeah. You don't think—do you think your sisters could have hurt the baby?

A. I don't know. H.A., she's a little rough.

Q. Okay.

A. Because usually when she plays with me, she tries to tackle me.

(Tr. page 586, lines 9-12, 25, and page 587, lines 1-5.) On re-direct, the defense asked B.A. the following questions:

Q. Okay. Has your parents ever had to tell her to be a little bit more gentler with the baby, that's she's being too rough? [sic]

A. Once.

Q. Okay. And do you--you play with the baby sometimes too, right?

A. Yes.

Q. And you said that you didn't intentionally do something but something may have happened accidently, [sic] right?

A. Yes.

(Tr. page 588, lines 9-18.) In sum, B.A. did not provide any evidence that Michael Adkins injured M.A.

{¶116} H.A. also testified. H.A.'s testimony was brief.

Q. Okay. H.A., do you ever remember seeing your daddy spank Baby M.A.?

A. He did not.

Q. Okay. Did you—do you remember telling anybody that he spanked—that he spanked Baby M.A.?

A. No.

(Tr. page 592, lines 6-11.) Therefore, H.A. also failed to present any evidence that Michael Adkins harmed M.A.

{¶117} The next witness called by the defense was Tim Berry. Mr. Berry was a neighbor and friend of Michael Adkins. Tim testified that Michael has "never showed any violence or anything toward the children." (Tr. page 594, line 16.) Mr. Berry provided no evidence that Michael Adkins injured M.A.

{¶118} Betty Cattee was the next witness for the defense. Ms. Cattee is Michael Adkins's aunt. Ms. Cattee testified about how M.A. was handled at the hospital when she was born.

Q. And what were you able to observe?

A. I was upset. I'm sorry, but I was totally upset because this baby should not have been bathed the way she was bathed. The nurse—I mean, you know, I got grandkids of my own but this nurse was holding this baby up by her ankle and instead of turning her to wash her this way, she lifted her up by her ankles, both ankles, both times and she washed her like this but she was rubbing her so hard her little flesh was red.

(Tr. page 605, lines 4-11.) Although the State cross-examined Ms. Cattee by questioning her about the experts' various opinions that differed from hers, Ms. Cattee still provided no evidence that Michael Adkins injured M.A.

{¶119} Carolyn Moore and Nancy Fodge also testified for the defense. Ms. Moore is also Michael Adkins's aunt. Nancy Fodge knew Michael Adkins through Christi. Neither Carolyn Moore nor Nancy Fodge provided any testimony or evidence that Michael Adkins harmed M.A.

{¶120} Larry Adkins, Michael Adkins's father, also testified for the defense. Mr. Adkins testified about his observations and opinions about Michael Adkins as a father.

> Q. Anything throughout the years, and you knowing him best as a parent I would hope, would cause you to be of any concern within any part of your body that Michael caused M.A.'s injuries?
>
> A. No.

(Tr. page 642, lines 23-25 and page 643, lines 1-2.) Like the rest of the witnesses, Mr. Adkins failed to provide any evidence that Michael Adkins injured M.A.

{¶121} Michael Adkins was the last witness to testify in the case. Even though he was questioned in detail by both the defense counsel and the State, Michael Adkins did not provide any testimony that he injured M.A. The defense rested; and the State did not call any rebuttal witnesses.

{¶122} The lead opinion finds that the jury's verdict was not against the manifest weight of the evidence and that sufficient evidence supported the conviction. I disagree with the judgment of the lead opinion.

{¶123} In *State v. Miley*, 114 Ohio App.3d 738, 684 N.E.2d 102 (4th Dist.1996), this Court reversed the conviction of Todd Miley. Todd Miley

had been convicted of felony child endangerment. Todd Miley and Tammy

Detty were the parents of J.M. J.M. was only a newborn when she suffered

from serious internal injuries. The pertinent facts that this Court recited are

as follows:

> * * * Doctors discovered that Jessica's skull, right and
>
> left tibias, right femur, left humerus, ribs five and seven, pelvis,
>
> and distal right radius were all fractured. Jessica also suffered
>
> from subdural effusions, retinal hemorrhaging, and
>
> interhemispheric blood. The doctors were unable to determine
>
> exactly when Jessica suffered these injuries.
>
> * * *

> The state's case consisted of testimony at trial from four
>
> doctors and a police detective as well as medical exhibits. The
>
> doctors uniformly agreed that Jessica suffered her injuries from
>
> intentional trauma: blows to the head, shaking, twisting, and
>
> pulling. The doctors rejected brittle-bone disease as an
>
> explanation for J.M.'s injuries. The doctors opined that J.M.
>
> had been injured by child abuse.

>Detective Hayburn testified that Detty told him that Miley and she were the only ones who had access to and cared for J.M. * * *

*Id*. at 741.

{¶124} This Court analyzed the sufficiency of the evidence in *Miley*. In doing so, the Court determined that the State relied upon circumstantial evidence to make its case. *Id.* at 744. This Court acknowledged that "[c]ircumstantial evidence inherently possesses the same value as direct evidence." *Id.*, citing *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 494 (1991), at paragraph one of the syllabus (superseded by statute and constitutional amendment on other grounds). This Court held that the State's circumstantial evidence did not prove that Miley was the one who abused J.M. beyond a reasonable doubt. *Id.* The Court stated:

>* * * The state's circumstantial evidence indicates that Miley and Detty were the only ones with access to [J.M.] and that [J.M.] was abused. However, this does not prove beyond a reasonable doubt that Miley abused [J.M.] Rather, it leads to the possibility that either Miley or Detty abused [J.M.]. Reasonable doubt is present when jurors cannot say they are firmly convinced of the truth of the charge. R.C. 2901.05(D); *State v.*

*Frazier* (1995), 73 Ohio St.3d 323, 330, 652 N.E.2d 1000,

1008. A fifty percent possibility does not satisfy the standard of

beyond a reasonable doubt. Therefore, reasonable minds could

only reach the conclusion that the state did not prove beyond a

reasonable doubt that Miley abused [J.M.].

*Id.*

{¶125}  The *Miley* case is strikingly similar to this case in that both

cases relied upon the fact that the fathers were caretakers of the minor

children. Like Todd Miley, Michael Adkins was not the only caretaker of

M.A. The State did not provide evidence that Michael Adkins was the only

person who provided care for M.A. As shown in the recitation of the facts

above, Mrs. Butler testified that Christi worked anywhere from 5 hours per

day for 2 to 3 days per week. Other than those 10 to 15 hours per week,

Christi was the primary caretaker of M.A. Detective Malone, Dr. Thackeray,

and Levi Swords all testified that both Christi and Michael Adkins were

caregivers for M.A. Christi also agreed that she was with the "kids a hundred

percent of the time" when she was not at work. (Tr. page 538, lines 3-6.)

{¶126}  Although the State's theory was that the injuries were

sustained while Christi was gone during her "adult time", the experts, Dr.

Smith and Dr. Thackeray, testified that the injuries could have been

sustained 7 to 14 days and 7 to 10 days prior to August 3, 2013, respectively. In addition, Dr. Cheatham testified that during his examination, he "did not see any obvious deformity, swelling, bruising." (Tr. page 72, line 24 and page 73, line 1.) Dr. Cheatham also testified that M.A. did not exhibit any signs of disturbance or pain. (Tr. page 73, lines 3-5.) Therefore, the injuries are quite likely to have occurred at a time different than on August 3, 2013 as the State propounds.

{¶127} As this Court stated in *Miley*, "[a] fifty percent possibility does not satisfy the standard of beyond a reasonable doubt." *Miley*, *supra*, at 744. Therefore, reasonable minds could only reach the conclusion that the State did not prove beyond a reasonable doubt that Michael Adkins abused M.A. The analysis of this dissenting opinion is not to minimize the injuries that M.A. has suffered. However, in the absence of sufficient evidence as to the critical issue of the causation and perpetrator of M.A.'s injuries, and in light of the other discrepancies in the circumstantial evidence, reasonable doubt is raised.

{¶128} I would sustain the first assignment of error with respect to the sufficiency of the evidence argument and find the manifest weight argument moot. As a result, I would reverse the trial court's judgment and

remand the case to the trial court to vacate the conviction of child

endangerment and to discharge Michael Adkins.

## JUDGMENT ENTRY

It is ordered that the JUDGMENT BE AFFIRMED and costs be assessed to Appellant.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Harsha, J.:   Concurs with Concurring Opinion.
Hoover, J.:   Dissents with Dissenting Opinion.

For the Court,

BY: _____
Matthew W. McFarland, Judge

**NOTICE TO COUNSEL**
**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**